# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2238

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DERRICK L. BULLOCK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:09-cr-10-TLS—**Theresa L. Springmann**, *Judge*.

ARGUED SEPTEMBER 28, 2010—DECIDED FEBRUARY 1, 2011

Before EASTERBROOK, *Chief Judge*, and SYKES and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge.* Derrick Bullock pleaded guilty to possession with intent to distribute at least five grams but less than fifty grams of cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1). His plea was conditioned on his ability to appeal the district court's denial of his motion to suppress evidence of the crack that led to his conviction. The events giving rise to Bullock's

arrest began when Detective John Greenlee of the Fort Wayne Police Department received an anonymous tip that someone by the name of "Quick" was selling cocaine from a residence on Euclid Street. Based on the information provided by the tipster, Greenlee was able to determine the address of the residence and that "Quick" was Bullock. Greenlee began surveillance of the residence and corroborated the tip by observing Bullock leaving the residence on several occasions and engaging in activity indicative of drug dealing. Armed with this information, Greenlee obtained a warrant to search the Euclid Street address.

Prior to execution of the warrant, during pre-raid surveillance, Greenlee observed Bullock leaving the residence in a vehicle driven by Sabrina Wilhelm, the lessee of the residence. Greenlee was aware that Wilhelm did not have a valid driver's license, so he instructed uniformed officers to stop the vehicle. Officers made the stop, transported Bullock back to the residence, and detained him in the squad car while they executed the search warrant. Upon finding marijuana in plain view on the dining room table in the residence, along with sandwich baggies containing a small amount of crack and a scale in another part of the residence, officers arrested Bullock for visiting a common nuisance under Indiana Code § 35-48-4-13(a). Bullock was taken to the police station where a search of his person revealed sixteen individually wrapped baggies of crack.

On appeal, Bullock claims that the crack was obtained as the result of an unlawful detention without reasonable

suspicion and subsequent unlawful arrest without proba-
ble cause in violation of the Fourth Amendment. The
district court disagreed and found that there was rea-
sonable suspicion to detain Bullock during the search,
relying on *Michigan v. Summers*, 452 U.S. 692 (1981), where
the Court held that police lawfully detained the
defendant (who was leaving his residence as officers
approached) while they executed a valid search warrant
of the residence. The district court further found that
probable cause existed to arrest Bullock for visiting a
common nuisance under Indiana law after officers
found marijuana in plain view and other evidence of
more widespread, continuous, and recurrent drug
activity within the residence. We affirm. Bullock's deten-
tion was lawful under the principles set forth in *Terry
v. Ohio*, 392 U.S. 1 (1968), and for similar reasons was
justified under *Summers*. We also find that his sub-
sequent arrest was supported by probable cause.

## I.

Detective Greenlee, who has been in the Vice and
Narcotics Division for eleven years, testified that on
November 3, 2008, he received an anonymous tip that
an individual using the name "Quick" was selling
narcotics out of a house on Euclid Street. The anon-
ymous caller had purportedly been to the house, had
spoken with "Quick" on several occasions, and was
aware that "Quick" was selling cocaine from that loca-
tion. The caller did not know the address of the

house, but he described it to Greenlee, informed him what side of the street it was on, and that red and blue chairs were out front.

Because neither Greenlee nor other officers had worked with the caller before, Greenlee took efforts to corroborate the caller's information. Through the police department's computer system, Greenlee discovered that "Quick" was Derrick Bullock; Greenlee also testified that he had prior knowledge that a subject by the name of Derrick Bullock used the nickname "Quick." Greenlee was also able to determine that the address of the house described by the caller was 2815 Euclid Street in Fort Wayne, Indiana.

Greenlee began surveilling the residence. Officers later learned that the residence was leased by Sabrina Wilhelm, but Bullock was the main target of their investigation. Although disputed evidence was introduced during the motion to suppress hearing, the district court did not find that Bullock lived there with Wilhelm. Rather, the two were dating and Bullock visited the residence. Between November 21, 2008, and December 2, 2008, Greenlee observed Bullock leave the residence on four occasions.

On November 21, 2008, Greenlee followed Bullock and a female (who officers later learned was Wilhelm) after they left the residence in a vehicle. Bullock was driving. Officers stopped the vehicle and arrested Bullock (the basis for the stop and arrest is not evident from the record). During the stop, officers discovered that Wilhelm's driver's license was suspended. Pursuant to a

search incident to arrest, officers found $500 on Bullock, mostly in $20 denominations. Greenlee testified that Bullock lied about his employment and that his investigation indicated that Bullock was unemployed. Because Bullock was unemployed and had a significant amount of cash in small denominations, Greenlee, based on his training and experience, believed that the money was obtained from drug sales. No drugs were found during the search.

Greenlee next observed Bullock leave the residence sometime between November 21 and December 1. Because he was helping with another investigation, Greenlee was unable to follow Bullock on that occasion. On December 1, Greenlee again followed Bullock after observing him leave the residence. Both times that Greenlee followed Bullock—on November 21 and December 1—Greenlee described Bullock's activity as follows:

> [T]he vehicle makes several short stops, sometimes meeting people as they were waiting on the porch. The person would come off the porch, they would turn into an alley. The person would get in the back seat of the car, the person would be in the car two to five minutes, and then get out of the vehicle on foot, stop in the house and the vehicle would leave.
>
> The vehicle would pull up along a side street, the person would approach it, be at the window for a up to a minute, a very short period of time and then walk away. The vehicle would leave again.

Greenlee did not see anything pass between Bullock and the other individuals during these short stops. Based on

his experience and training, Greenlee testified that such activity is indicative of drug dealing.

On December 2, 2008, officers obtained a search warrant for the Euclid Street address to search for evidence of narcotics, which they proceeded to execute that same day. Greenlee was responsible for the pre-raid surveillance before execution of the warrant. The search warrant was based on the anonymous tip and Greenlee's corroboration of that information. During pre-raid surveillance, Greenlee observed Wilhelm, her children, and Bullock leave the residence in a vehicle; Wilhelm was driving. Greenlee was aware from the November 21 stop that Wilhelm's driver's license was suspended. Greenlee began following the vehicle. Because he was not in uniform and had an undercover vehicle with no lights or sirens, he radioed other uniformed officers, who were positioned near the residence as part of the search warrant team, to make the stop. Uniformed officers Jean Gigli, Mark Deshaies, and Angie Reed followed the vehicle and executed a stop about ten to fifteen blocks from the residence (within about three minutes of the car leaving the premises). Greenlee waited for Wilhelm and Bullock to get out of the car; he then returned to the residence to prepare for execution of the warrant.

Greenlee instructed Gigli to place Bullock in custody once he made the stop. Greenlee testified that his intention was to bring Bullock back to the residence during execution of the search warrant. Gigli approached Bullock on the passenger's side of the vehicle and Reed

approached Wilhelm on the driver's side. Bullock testified that an officer pulled Wilhelm aside and said, "I have a search warrant to search your house. Where [are] your keys at?" Wilhelm reached in her purse and gave the officer a key to the house. Greenlee was informed that a key was obtained during the traffic stop, but was not sure if it came from Bullock or Wilhelm. Officers used the key to gain entry into the residence.

Either Reed or Deshaies asked if there were any drugs in the house, and Wilhelm responded that there was marijuana in the dining room. Greenlee testified that "from things that Ms. Wilhelm had told us at the traffic stop, [we] . . . wanted to keep a hold of [Bullock] to talk to him further about drugs that were in the house that she had told us about." Bullock was handcuffed, patted down, and placed in the back of Gigli's squad car. Bullock was advised that he was being detained for further investigation. The officers did not find drugs in the car or on Bullock (at that time). About ten or twenty minutes after the stop (the officers could not testify to exact times, but gave approximations), Gigli transported Bullock back to the residence, where he stayed in the squad car. The search was underway. Wilhelm remained at the scene of the traffic stop with her children until their father could come get them.

During the search, officers found a lighter next to a box that contained marijuana on a table located in a central part of the house, a large ball of plastic baggies that contained small amounts of crack cocaine, a gun in the upstairs bedroom, and a digital scale. (Bullock

does not challenge the justification for the residence search.) Greenlee did not testify where the baggies and scale were found, but it appears, from the photographs introduced at the hearing, that they were in a kitchen cabinet. With respect to the marijuana, Greenlee testified that "you could not have walked through the house without seeing the drugs there in plain view, as the photos depicted on the kitchen table." (Some of the witnesses described the table as a "kitchen" table and others as a "dining room" table but they were all talking about the same table in a central and open part of the house.) Photographs taken during the search confirm that the marijuana was in an open box on the table. Greenlee opined, based on his experience and training, that the items seized during the search were consistent with both drug use and distribution. Bullock remained at the residence for about twenty minutes before he was transported to the station and charged with visiting a common nuisance under Indiana Code § 35-48-4-13(a). Wilhelm was charged with maintaining a common nuisance under Indiana Code § 35-48-4-13(b).

After transporting Bullock to the police station, officers conducted a strip search of Bullock and discovered sixteen individually wrapped baggies of crack cocaine concealed "in" his buttocks. (The record is not clear how probing a search was required to locate the crack cocaine. Obviously, the earlier pat-down did not reveal the drugs. Bullock, however, does not complain about the conduct of the station house search.) These drugs provided the basis for the government's indictment and Bullock's plea of guilty for knowingly possessing crack with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

**II.**

Bullock moved to suppress the crack found on him, arguing that officers unlawfully detained him during the search and lacked probable cause to arrest him. After holding an evidentiary hearing, the district court found Bullock's detention lawful under *Michigan v. Summers*, 452 U.S. 692 (1981), even though he was a visitor of the residence and was detained after leaving the premises. The district court reasoned that Bullock was pulled over a short distance from the residence and was the subject of the officers' investigation; thus, his detention was based on the officers' articulable and individualized suspicion that Bullock was engaged in criminal activity in connection with the residence. The court also reasoned that upon discovering that a warrant had been issued, Bullock became a flight risk. Further, the court found that there was probable cause to arrest Bullock for visiting a common nuisance after officers found marijuana in the residence in plain view, along with baggies (containing a small amount of crack) and a scale in another location. The court explained that a common-sense view of the everyday realities of life would suggest to police that Bullock was aware that Wilhelm used drugs inside her home. Bullock appeals these findings.

On a motion to suppress, we review questions of law de novo and questions of fact for clear error. *United States v. Clinton*, 591 F.3d 968, 971 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 246 (Oct. 4, 2010). Where there are mixed questions of law and fact, our review is de novo. *United States*

*v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009). Under clear error review, "we will not overturn the district court's factual findings unless left with a definite and firm conviction that the district court was mistaken." *Clinton*, 591 F.3d at 971 (quotation omitted). We give special deference to the district court's credibility determinations. *Burnside*, 588 F.3d at 517.

### A.  Seizure of Bullock

Bullock does not dispute that the officers had probable cause to stop Wilhelm for driving on a suspended license. He argues, though, that after officers patted him down and searched the vehicle, he should have been free to leave the scene because they had no reasonable suspicion to continue detaining him while they searched Wilhelm's residence. He had already left the premises of the search and was not living at the residence, but was merely a visitor. Accordingly, Bullock contends that his detention was not proper under the principles set forth in *Summers*.

We disagree. Bullock's approach overlooks the authority that law enforcement had to detain him under *Terry* based on information the police possessed at the time of the stop. Bullock was the target of the officers' investigation and his association with the residence led to a finding of probable cause for the search warrant. Based on the information obtained from the anonymous tipster and Greenlee's subsequent investigation, officers had an articulable basis for suspecting that Bullock was engaged in drug activity from that residence. Further, once Wilhelm informed officers that she had marijuana

in her dining room, they had reasonable suspicion to believe that Bullock was visiting a common nuisance. Officers, therefore, could detain Bullock during the search warrant even though he was not living at the Euclid Street address and had left the premises before the search was underway. Further, when officers stopped the vehicle, they reasonably informed Wilhelm of the search warrant so they could obtain keys to the residence. At that time, Bullock was made aware of the warrant and officers had an interest in preventing Bullock's flight in the event incriminating evidence was found during the search and in minimizing risk of harm to the officers.

The length of detention—thirty to forty minutes—was limited to the legitimate needs of the officers in conducting further investigation. The manner of detention—being handcuffed, placed in the back of a squad car, and transported to the residence—while undoubtedly intrusive, was not unreasonable under these circumstances. Even if the manner of detention was too intrusive, officers were reasonable in detaining Bullock during the search, and he would have inevitably been arrested (either at the scene of the traffic stop or at the residence) after officers located the contraband in the house. Bullock does not dispute that after being arrested and taken into custody, the crack on his person would have been discovered.

For many of the same reasons, we find Bullock's detention also justified under *Summers*. Given the facts known to the officers at the time, they had the authority to

detain Bullock during execution of the search warrant; he was the subject of the officers' investigation, had just left the premises, was pulled over as soon as reasonably practicable, and once informed of the warrant, became a flight risk and posed a potential danger to the officers conducting the search. The detention of Bullock was warranted because the additional intrusion caused by detention was slight and the justifications were substantial.

### 1. Investigative Detention under *Terry*

The government argues that reasonable suspicion under *Terry* existed to detain Bullock. We agree. "Although an officer does not need probable cause to conduct an investigatory stop, the brief detention must be based on reasonable suspicion that the stopped individual has or is about to commit a crime." *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). When determining if seizure exceeds the bounds of *Terry*, the court should ask: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994).

An investigatory stop is proper "if the officer making the stop is 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity." *Id.* at 1224 (quoting *Terry*, 392 U.S. at 21-22). "Reasonable suspicion is a lower threshold than probable cause and does not deal with hard certainties, but with proba-

bilities." *Booker*, 579 F.3d at 839 (quotation omitted). It "requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quotations omitted). Because "[r]easonable suspicion is a less demanding standard than probable cause[,] . . . [it] can arise from information that is less reliable . . . ." *Alabama v. White*, 496 U.S. 325, 330 (1990).

The reasonableness of the stop is based on an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Tilmon*, 19 F.3d at 1224 (quoting *Terry*, 392 U.S. at 22). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry. *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007); *see also United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (subjective intentions play no role in Fourth Amendment analysis).

The officers had reasonable suspicion of Bullock's criminal activity and could detain him briefly while they investigated their suspicion, i.e., while they searched the Euclid Street residence. Greenlee received an anonymous tip that an individual using the name "Quick" was

selling narcotics out of a house on Euclid Street. The anonymous caller had purportedly been to the house, had spoken with "Quick", and was aware that "Quick" was selling cocaine from that location. The caller did not know the address of the house, but described it to Greenlee, informed him what side of the street it was on, and that red and blue chairs were out front. The anonymous tip alone would not justify a *Terry* stop. *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 270-71 (2000) (holding that an anonymous tip, without more, was not sufficient to justify an officer's stop and frisk); *see also United States v. Robinson*, 537 F.3d 798, 802 (7th Cir. 2008) (anonymous sources are less reliable because officers "have no way to hold the source responsible if the information turns out to be fabricated"). However, an anonymous tip, adequately corroborated, may provide sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop. *J.L.*, 529 U.S. at 270.

After receiving the anonymous tip, Greenlee undertook efforts to corroborate the caller's information. Greenlee identified "Quick" as Bullock through the police department's computer system, located the address of the residence based on the caller's description, observed Bullock leave the residence on four occasions during the course of eleven days, and observed Bullock on two occasions engage in behavior consistent with a drug courier or distributor upon leaving the residence. Specifically, Greenlee followed Bullock and observed him engage in short stay visits at various residences; individuals would get into Bullock's car for two to five minutes or they would approach the vehicle's window for

a short period (up to a minute) and then walk away. Based on his training and experience, Greenlee testified that such actions were indicative of drug dealing. *See, e.g.*, *Burnside*, 588 F.3d at 518 ("In forming a reasonable belief that a drug transaction occurred, [police] were permitted to view the events through the prism of their training and experience."); *United States v. Funches*, 327 F.3d 582, 584, 586-87 (7th Cir. 2003) (Drug Enforcement Administration ("DEA") agents had probable cause to believe that drug transaction had occurred based on their experience in narcotics enforcement; agents observed the exchange of shopping bags under circumstances they recognized as having common characteristics of drug transactions).

On November 21, after observing these short-stay visits, officers pulled over Bullock and, during a search incident to arrest, found $500 on his person, mostly in $20 denominations. Upon investigation, Greenlee discovered that Bullock was unemployed. Greenlee testified that based on his training and experience, he believed the cash found on Bullock was from drug sales even though no drugs were found. "In forming his suspicions, [Greenlee] was entitled to assess the circumstances and the defendant['s] behavior in light of his experience as a police officer and his knowledge of drug courier activity." *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996). Although a wad of cash is not itself suspicious, it becomes suspicious when found in the "hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs[.]" *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994).

Even though Greenlee did not observe drug-dealing activity taking place at the residence, Bullock's suspicious activity upon leaving the residence on two occasions, including the discovery of a relatively large sum of money on Bullock, corroborated the anonymous caller's tip of drug-dealing activity. In fact, it was Bullock's association with the Euclid Street residence that led to the search warrant. At the time of the stop, officers had reasonable suspicion that Bullock was and had been engaged in criminal activity and could detain him for a brief period upon further investigation. *See, e.g.*, *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (finding reasonable suspicion where officers knew that 500 kilograms of cocaine was in garage, and they observed defendant enter the garage, stay for ten minutes and drive out); *United States v. Chaidez*, 919 F.2d 1193, 1199 (7th Cir. 1991) (reasonable suspicion existed where agents received tip from reliable informant that defendant was major heroin dealer, defendant's name came up in other drug investigations, and police observed defendant driving evasively, engaging in brief and furtive meetings, scurrying in and out of restaurants known to be frequented by drug dealers, and carrying a plastic bag used in the drug trade); *see also United States v. Sophie*, 900 F.2d 1064, 1072-73 (7th Cir. 1990) (finding higher standard of probable cause met where officers observed known drug dealer make and receive phone calls and a message on his pager before meeting with defendant for about 30 seconds, during which time they got inside defendant's car and passed a tote bag back and forth).

Bullock contends that for officers to detain him pursuant to *Terry* there must be "a basis for believing that the person is engaging (present tense) in criminal activity or is about to be engaged (future tense) in criminal activity." Reply Br. 3. However, officers can stop and detain a suspect for reasonable suspicion that the suspect has engaged in a completed felony. *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in . . . a completed felony, then a *Terry* stop may be made to investigate that suspicion."); *Booker*, 579 F.3d at 838-39 (reasonable suspicion existed to stop and detain defendant who was suspected of having committed battery).

While it is true that during the stop and pat-down officers did not find evidence of ongoing criminal activity, Wilhelm told them that she had marijuana in her house in the dining room, providing further reasonable suspicion to detain Bullock during the search. Bullock had just left the residence and had been there on at least three prior occasions. The officers could reasonably suspect that he was aware of the marijuana. The officers therefore had this information, along with their reasonable suspicion that Bullock was a drug dealer and had sold drugs on previous occasions upon leaving the residence.[1]

---

[1] In fact, a good argument could have been asserted that the officers had probable cause to arrest Bullock for drug distribu-

(continued...)

We acknowledge that unlike in this case, the police in *Hensley* had been unable to locate the suspect. 469 U.S. at 229. But that difference does not lessen the government's strong interest in detaining Bullock to prevent flight while they conducted their search. Further, Bullock's suspected drug-dealing activity was not completed in the sense that he was engaging in ongoing criminal behavior that posed an ongoing threat to the public.

The next question is whether the degree of intrusion was reasonably related to the known facts. "The reasonableness of the stop may depend, in part, on the extent of the intrusion." *United States v. Ienco*, 182 F.3d 517, 523 (7th

---

[1] (...continued)

tion even before the stop based on the same information officers used to obtain the search warrant for the residence. Even though officers ultimately arrested Bullock for visiting a common nuisance, not drug distribution, their "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153-56 (2004); *see also United States v. Tinnie*, No. 09-4082, 2011 WL 135715, at *3 (7th Cir. Jan. 18, 2011) (stating that when judging the constitutionality of a search or seizure, "we are not limited to what the stopping officer says or to evidence of his subjective rationale") (citation omitted). Further, when Wilhelm admitted during the traffic stop that she had marijuana in her dining room, the police may have had probable cause to arrest Bullock for the common nuisance violation. We do not address these issues though because the government did not argue that there was probable cause to justify the pre-search detention, and so, it has forfeited that argument.

Cir. 1999). A *Terry* investigative stop is "a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *Vega*, 72 F.3d at 515 (quotation omitted). "For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994) (citing *United States v. Sharpe*, 470 U.S. 657, 685-86 (1985)). We use a sliding-scale approach when addressing the reasonableness of an investigatory stop. *Tilmon*, 19 F.3d at 1226. "[S]tops too intrusive to be justified by suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and the duration of restraint." *Chaidez*, 919 F.2d at 1198. A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive. *Robinson*, 30 F.3d at 784.

The "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). There is no rigid time limit placed on *Terry* stops; "common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685. When determining the reasonableness of the length of detention, the court should consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectu-

ate those purposes, and whether the police diligently pursued their investigation. *Id.* at 685-87.

Before being taken to the police station, Bullock was detained for thirty to forty minutes. The police diligently pursued their investigation in executing the search warrant. Bullock was taken to the residence ten to twenty minutes after the stop and when he arrived, the search was underway. When the search was complete, officers transported Bullock to the station. Nothing in the record suggests that the officers unnecessarily prolonged the search or acted less than diligently. Bullock's detention while officers investigated his suspected criminal activity was reasonable and justified under the circumstances. *See, e.g., Sharpe*, 470 U.S. at 687 (twenty-minute delay waiting for DEA agent to arrive and investigate was not unreasonable); *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (twenty-five minute delay reasonable to investigate whether defendant was taking part in drug activity in hotel room given number of subjects and their reluctance to reveal their names and why they were at motel); *Robinson*, 30 F.3d at 784 (twenty-minute detention reasonable while officers questioned suspects about their identities and activities, contacted other officers to inform them of the encounter, and made a number of calls to verify co-defendant's identity); *Vega*, 72 F.3d at 515-16 (sixty-two minute delay was reasonable given that defendant initially consented to search of garage but then changed his mind and drug-sniffing dog was called to examine the defendant's car); *cf. United States v. Place*, 462 U.S. 696, 709 (1983) (ninety-minute detention of luggage while police arranged

for dog sniff was unreasonable where police did not diligently pursue investigation); *Ienco*, 182 F.3d at 525 (thirty-minute detention in locked squad car was too long where reasonable suspicion was weak and suspects were not dangerous).

Whether Bullock's seizure amounted to a de facto arrest when he was handcuffed, placed in the squad car, and transported to the residence is a closer question. Admittedly, the facts here approach the outer boundaries of a permissible *Terry* stop. "Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest." *Tilmon*, 19 F.3d at 1224. Police restraint may become so intrusive that, while not technically an "arrest," it becomes "tantamount" to an arrest requiring probable cause. *Id.* (citing *Dunaway v. New York*, 442 U.S. 200, 212-16 (1979)). "Given the 'endless variations in the facts and circumstances,' there is no 'litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop' and becomes an arrest." *Id.* (quoting *Royer*, 460 U.S. at 506). The question is whether the officer's actions were reasonable under the circumstances and whether the surrounding circumstances gave rise to a justifiable fear for personal safety on the part of the officer. *Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008).

We have previously found that using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory deten-

tion, depending on the circumstances. *Tilmon*, 19 F.3d at 1224-25, 1228; *see also United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (stating that police officers do not convert *Terry* stop into full custodial arrest by drawing their weapons or handcuffing the subject, particularly where the situation is inherently dangerous); *Chaidez*, 919 F.2d at 1198-99 (detention did not turn into arrest even though agents drew guns, took car keys, gave *Miranda* warnings, took one defendant to police van to sign consent-to-search form, and detained defendants for ten to fifteen minutes during search of house; the intrusion was less than that involved in an arrest).

Given that officers were conducting a search for drugs, it was reasonable to place Bullock in handcuffs and in the squad car for their safety while they pursued their investigation. Even though officers patted down Bullock and did not discover any weapons, the officers could take precautions against potentially violent behavior. Drug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution. *United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) ("Drug arrests can warrant intrusive tactics because of their inherent danger."). Officers could reasonably believe that Bullock was potentially dangerous and a flight risk because of his awareness of the search warrant, his association with the residence, and the officers' reasonable suspicion that he was involved in narcotics distribution. His detention in the squad car was therefore reasonable.

This is not a case where officers attempted to exploit the situation by asking Bullock questions or requesting

to search his belongings. *Cf. Royer*, 460 U.S. at 504-05 (holding legitimate law enforcement purposes which justified detention in the first instance were not furthered by removing suspect to small interrogation-type room in an apparent effort to obtain his consent to search his luggage). Rather, the restraints were used to meet the officers' legitimate interest in safety and security while briefly investigating suspected drug activity.

Under the circumstances, Bullock's short transport back to the residence was also proper. Bullock had just left the residence and was ten to fifteen blocks away at the time of the traffic stop. It was logical to take him back to the residence where other officers were performing a search that could implicate him in criminal activity. *See, e.g.*, *United States v. Yang*, 286 F.3d 940, 950 (7th Cir. 2002) (transportation from airport tarmac to international terminal did not transform stop for suspected drug activity into arrest where it was of short duration and necessary to confirm the officer's suspicion given that drug-testing equipment was at the customs office); *Vega*, 72 F.3d at 515-16 (holding that defendant's stop was "not tantamount to an arrest" even though "the officers drew their weapons, asked [defendant] to accompany them [back to the crime scene] in one of their cars," and kept him in "the officer's vehicle for a little over an hour" where officers had reasonable suspicion that the defendant was involved in massive cocaine importation conspiracy). In fact, returning Bullock to the private residence he just left was less intrusive than continuing to detain him roadside in public view. The manner of seizure in this case was reasonable in light of the circumstances.

Even assuming the manner of seizure was overly intrusive, the length of Bullock's detention was reasonable and the officers would have inevitably arrested him after the residence search. As further discussed below, once officers searched the house, they had probable cause to arrest Bullock for visiting a common nuisance, at which point they could take Bullock to the station and search him.[2] He would have been arrested and searched even if merely detained at the traffic stop without restraints.

In *United States v. Swift*, 220 F.3d 502, 504 (7th Cir. 2000), officers stopped the defendants in their vehicle and seized them, having reasonable suspicion to believe they just committed bank robbery. The officers contacted Captain Sherbun who said the names of the suspects "rang a bell" and believed they were involved in past robberies that were carried out in a similar pattern. *Id.* at 504-05. Sherbun directed the officers to take the defendants to the station where police confiscated a pager that later led to evidence linking the defendants to the robbery. *Id.* at 505. Shortly after the defendants were taken to the station, Sherbun arrived at the scene of the stop, looked inside the vehicle, and discovered items connecting the defendants to the crime. *Id.*

We stated in *Swift* that when the defendants were taken to the station they were under arrest, arguably without

---

[2] As previously stated in footnote 1, the government chose not to assert viable arguments that the police had probable cause to arrest Bullock for drug distribution and visiting a common nuisance before they detained him.

probable cause. *Id.* at 508. The information the officers had, though, provided a sufficient basis to continue detaining the defendants until Sherbun showed up at the scene of the stop. Probable cause was established once Sherbun saw the incriminating evidence in the vehicle. *Id.* We noted that at the time the defendants were taken to the station, officers were continuing to investigate the crime and if the defendants had been held at the scene, they would have been lawfully detained for thirty-two minutes under an investigatory stop. *Id.* at 509. We reasoned that in some situations, "maintaining the status quo while obtaining more information . . . might be the most reasonable action to take." *Id.* We determined that if the defendants had been detained at the scene, the police would have inevitably seized the pager. Therefore, "[t]he pager and the evidence to which it led [were] not fruit of the poisonous tree" and should not have been suppressed. *Id.* at 510; *see also United States v. Simms*, 626 F.3d 966, 971 (7th Cir. 2010) (stating that even if the police did not have probable cause to search defendant's car, defendant was about to be arrested and jailed indefinitely, his car would have eventually been impounded by the police and subject to an inventory search, so the discovery of the gun therein was inevitable*).*

We find the reasoning in *Swift* instructive here. Officers could have detained Bullock at the scene of the traffic stop to maintain the status quo while they continued their brief investigation. They had the search warrant in hand and within about ten minutes of the stop, the

search was underway. The length of Bullock's detention was reasonable and the officers acted diligently. If Bullock had been detained at the scene without restraints, instead of placed in the squad car and taken to the residence, officers would still have found the marijuana and evidence of drug-dealing activity, thereby providing (if not bolstering) probable cause to arrest Bullock. Once arrested, a search of his person would have revealed the crack.

Accordingly, Bullock's detention was reasonable under *Terry*; officers acted diligently in searching the residence to investigate their well-founded suspicions of his criminal activity.

### 2. Detention during Execution of Warrant under *Summers*

For many of the same reasons outlined above, Bullock's detention was also justified under *Michigan v. Summers,* 452 U.S. 692 (1981). The Court in *Summers* extended *Terry* beyond the "momentary, on-the-street detention" to the detainment of a resident or occupant who is on the premises while a search pursuant to a warrant is conducted. *Summers*, 452 U.S. at 700-05. A detention under *Summers* is analogous in certain respects to a *Terry* stop. *See United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1995) ("While detention during the execution of a search warrant is not a traditional *Terry* stop, it is sufficiently analogous for us to conclude that, in the usual case, *Miranda* warnings are not required.").

The Court in *Summers* held that officers executing a search warrant for contraband have "the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. The detention of an occupant is warranted "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (citing *Summers*, 452 U.S. at 701-05) (observing that an "officer's authority to detain incident to a search is categorical"). The Court indicated three legitimate law enforcement justifications for detention during execution of a search warrant: (1) to prevent flight in the event incriminating evidence is discovered; (2) to minimize the risk of harm to the officers; and (3) to facilitate the orderly completion of the search. *Summers*, 452 U.S. at 702-03.

In *Summers*, police officers were about to execute a warrant to search a house for narcotics when they encountered the defendant descending the front steps. *Id.* at 693. The officers detained the defendant, who was the resident of the premises, during the search. The Court found that defendant's detention in his home was "surely less intrusive than the search itself[,]" because it "could add only minimally to the public stigma associated with the search . . . and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 701-02. The Court further reasoned that once "[a] judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime[,]" . . . "[t]he

connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 703-04.

We have extended the rationale of *Summers* to visitors of a home. *See United States v. Pace*, 898 F.2d 1218, 1239 (7th Cir. 1990) (reasoning that defendants' connection as visitors "to the condominium gave the officers 'an easily identifiable and certain basis'" for detaining them during the search) (quoting *Summers*, 452 U.S. at 703-04); *see also United States v. Jennings*, 544 F.3d 815, 818-19 (7th Cir. 2008) (relying on *Summers* to find lawful the brief detainment of defendant who had entered security perimeter surrounding targeted apartment where narcotics search was underway). The issue here is whether the reasoning in *Summers* should be extended to an individual who has left the residence before execution of the search warrant, is pulled over a few blocks away, and is detained during the search. Under the particular facts of this case, we find that it should. Bullock's detention was reasonable given his suspected criminal activity in connection with the residence, his risk of flight, and the potential danger he posed to officers if not detained. He was detained for thirty or forty minutes at a residence he had just left and had visited on multiple occasions; the officers' interests in detaining him during the search were not outweighed by this rather limited intrusion on his freedom.

Other circuits have extended *Summers* in similar circumstances. In *United States v. Cochran*, 939 F.2d 337, 338

(6th Cir. 1991), police officers went to the defendant's residence to execute a search warrant and observed the defendant leaving the premises. *Id.* Officers did not want to forcibly enter the premises knowing that there was a guard dog inside. *Id.* Accordingly, the officers stopped the defendant shortly after he exited the premises and requested assistance in entering the house. *Id.* The court, relying on *Summers*, found that his detention was reasonable. *Id.* at 339. The court explained that "*Summers* does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence." *Id.*

The Fifth Circuit similarly extended *Summers*. In *United States v. Cavazos*, 288 F.3d 706, 708 (5th Cir. 2002), officers were conducting surveillance of a residence in preparation of executing a search warrant. The defendant and two others left the residence in a truck, pulled up closely to the officers' vehicle and peered inside. *Id.* The truck drove away and the officers followed. *Id.* The truck then made a U-turn, approached the officers, and crossed over into the officers' lane, creating a standoff. *Id.* Both vehicles stopped, and the officers exited their vehicle with guns drawn. *Id.* The officers took defendant back to the residence and detained him during the search. *Id.*

The court in *Cavazos* found the officers' actions lawful under *Summers*. *Cavazos*, 288 F.3d at 711. The defendant's

connection to the residence gave officers an "'easily identifiable and certain basis for determining that suspicion of criminal activity justifie[d] a detention of that occupant.'" *Cavazos*, 288 F.3d at 711 (quoting *Summers*, 452 U.S. at 703-04). The officers also had reason to believe that he was performing some type of counter-surveillance when he drove the truck toward them in a threatening manner. *Id.* "This conduct warranted the belief that [the defendant] would have fled or alerted the other occupants of the residence about the agents nearby if he were released immediately after the stop and frisk." *Id.* The court noted that while "[t]he proximity between an occupant of a residence and the residence itself may be relevant in deciding whether to apply *Summers*, . . . it is by no means controlling." *Id.* at 712.

Other circuits have declined to extend *Summers* to a resident or occupant who has left the residence to be searched. In *United States v. Sherrill*, 27 F.3d 344, 345 (8th Cir. 1994), officers obtained a search warrant based on reliable information that defendant was dealing drugs from his residence. *Id.* Before execution of the warrant, the defendant left the premises and officers stopped him a block away, informed him that they had the warrant, and detained him during the search. *Id.* Officers handcuffed him, read him his rights, and took him back to the residence. *Id.* at 345-46. The court found that *Summers* did not apply because the defendant had already left the premises, so "the intrusiveness of the officers' stop and detention on the street was much greater." *Id.* at 346. Further, although the defendant helped the officers conduct the search, when they stopped defendant, they

did not have any interest in preventing flight or mini-mizing the search's risk because the defendant had left the area and was unaware of the warrant. *Id.*

In *United States v. Edwards*, 103 F.3d 90, 91 (10th Cir. 1996), police prepared to execute a search warrant of a suspected "drug house." The defendant, an ex-convict in a drug rehabilitation program, was a frequent visitor of the house. Before the search, police observed the defendant leave the house. They pulled him over, suspecting that the vehicle contained drugs and that he might be armed and dangerous. *Id.* The defendant was detained street-side for forty-five minutes, during which time officers drew their guns and handcuffed him. *Id.* The officers did not find contraband or drugs on him or in the vehicle, but he did have keys to the house. *Id.* at 91-92. The forty-five minute detention, the court found, was unreasonable because by the conclusion of the search of the house, the officers no longer possessed the "reasonable suspicion" that initially justified the stop. *Id.* at 93. The court also declined to extend *Summers* because prior to the stop the defendant was unaware that a warrant was being executed so he had no reason to flee. *Id.* at 94. Further, the defendant did not pose a risk of harm to the officers and his detention played no part in facilitating the orderly completion of the search. *Id.*

Unlike in *Sherrill* and *Edwards*, the particular facts of this case warrant extension of *Summers*. The officers had probable cause to pull Wilhelm over for driving on a suspended license. Although they pulled her over ten to

fifteen blocks from the residence, Greenlee testified that he had to radio uniformed officers to make the stop and there is nothing to suggest that the vehicle was not pulled over as soon as practicable. During the stop, officers reasonably informed Wilhelm of the search warrant, at which point Bullock became aware of the warrant. Once aware of the warrant, he became a flight risk and a potential risk to the officers' safety in executing the warrant given his suspected illegal association with the residence. *See Summers*, 452 U.S. at 702 (recognizing the execution of a warrant to search for drugs "may give rise to sudden violence or frantic efforts to conceal or destroy evidence").

Bullock's detention was not unreasonably prolonged. He was at the traffic stop scene for ten to twenty minutes before he was taken to the residence and by the time he returned to the residence, the search was underway. *See, e.g.*, *Muehler*, 544 U.S. at 100 (finding two- to three-hour detainment of occupant in handcuffs reasonable while police searched premises because such restraints did not outweigh government's continuing safety interests). Officers did not exploit the detention by trying to obtain additional evidence from Bullock during execution of the search warrant. *See Summers*, 452 U.S. at 701 (stating that detaining an occupant during execution of a search warrant is "not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention"); *see also Pace*, 898 F.2d at 1239 (finding detention of visitors in home during execution

of search warrant reasonable in part because the police did not exploit the detentions to obtain information or search them except for performing a pat-down).

Further, the use of handcuffs was reasonable. "Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98-99. While a roadside detention followed by handcuffs and placement in a squad car certainly carries more stigma than a detention in one's home, the facts in this case warranted the additional intrusions for the limited time to execute the search warrant.

## B. Probable Cause to Arrest

After execution of the search warrant, officers arrested Bullock for visiting a common nuisance under Indiana Code § 35-48-4-13(a). Bullock contends that officers did not have probable cause to arrest him for this crime because there was nothing to indicate he was aware of the marijuana in the dining room or that drugs had been used at the residence on multiple occasions. The government responds that there was probable cause to arrest Bullock for visiting a common nuisance.[3]

---

[3] As previously noted, the government confined its justification for the arrest to the common nuisance charge about which Bullock complains. What both parties apparently fail to recognize is that under our Supreme Court's holding in *Devenpeck*

(continued...)

A determination of probable cause is based on prob-
abilities and "does not require evidence sufficient to
support a conviction, nor even evidence demonstrating
that it is more likely than not that the suspect committed

---

3 (...continued)
*v. Alford*, 543 U.S. 146, 153-56 (2004), the Fourth Amendment
reasonableness inquiry is not driven by the police's sub-
jective reasons for arresting an individual.

Although officers stated that they arrested Bullock for
visiting a common nuisance, they had probable cause to arrest
him for drug distribution, possibly before, but certainly after,
execution of the search warrant. "[A]n arrest is reasonable
under the Fourth Amendment so long as there is probable
cause to believe that *some* criminal offense has been or is
being committed, even if it is not the crime with which the
officers initially charge the suspect." *Fox v. Hayes*, 600 F.3d
819, 837 (7th Cir. 2010) (citing *Devenpeck*, 543 U.S. at 153-56).
In *Devenpeck*, the Supreme Court rejected "[t]he rule that the
offense establishing probable cause must be 'closely related' to,
and based on the same conduct as, the offense identified by
the arresting officer at the time of arrest." 543 U.S. at 153
("[T]he fact that the officer does not have the state of mind
which is hypothecated by the reasons which provide the
legal justification for the officer's action does not invalidate
the action taken as long as the circumstances, viewed objec-
tively, justify that action.") (citations omitted). "[T]he issue
is whether a reasonable officer, with the same information
known . . . at the time, would have had probable cause to
arrest [the defendant] for *any* offense." *Williams v. Rodriquez*,
509 F.3d 392, 399 (7th Cir. 2007) (emphasis added). But we
will limit our analysis to the common nuisance charge be-
cause the government chose to defend the arrest on that basis.

a crime." *Funches*, 327 F.3d at 586 (quoting *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001)). As such, "standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). To find probable cause, there need only be a probability or a substantial chance that criminal activity exists. *Purvis v. Oest*, 614 F.3d 713, 722-23 (7th Cir. 2010).

Probable cause is a "commonsense, nontechnical conception that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quotations omitted). In determining whether suspicious circumstances rise to the level of probable cause, officers are entitled to draw reasonable inferences based on their training and experience. *Funches*, 327 F.3d at 586.

"A police officer's probable cause determination depends on the elements of the applicable criminal statute." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010). After being detained at the residence, officers arrested Bullock for violating Indiana's common nuisance statute, which makes it a Class B misdemeanor for any person to "knowingly or intentionally visit[ ] a building, structure, vehicle, or other place that is used by any person to unlawfully use a controlled substance." Ind. Code § 35-48-4-13(a). To convict a person of this offense, the state must prove that the defendant knew the residence was used for the unlawful use of con-

trolled substances. *Bass v. State*, 517 N.E.2d 1238, 1239-40 (Ind. Ct. App. 1988) (per curiam). The state must also prove that the residence has been used for the unlawful use of controlled substances on more than one occasion. *Id.*

Indiana courts have found insufficient evidence to convict a defendant of visiting a common nuisance where drugs were not in plain view of the defendant. *See id.* (holding that the state did not introduce sufficient evidence to establish defendants knew residence was used for unlawful use of controlled substances because there was nothing to show that drugs were visible from defendants' viewpoint even though officers found drug paraphernalia—a bong with residue containing hashish and marijuana—on table next to where they were sitting); *see also Braster v. State*, 596 N.E.2d 278, 279 (Ind. Ct. App. 1992) (stating that court "cannot assume from the evidence presented at trial that defendant knew that a controlled substance was being used at the residence"; there was no evidence that paraphernalia was found in kitchen where defendant was present or within his plain view).

Conversely, where drugs are in plain view of the defendant, courts have found sufficient evidence to show that the defendant had knowledge of drug use. *Hale v. State*, 785 N.E.2d 641, 643 (Ind. Ct. App. 2003) ("We cannot say that [defendant], who was sitting within plain view of the shoebox full of marijuana did not have knowledge that [the] residence was being used for the unlawful use of a controlled substance."); *see also Zuniga v. State*, 815 N.E.2d 197, 200 (Ind. Ct. App. 2004) (sufficient evidence existed to show knowledge of drug use where

defendant stepped inside garage; detectives smelled burnt marijuana in there; and detectives found smoking devices, rolling papers, a rolling machine, residue of marijuana and blunt cigars in garage).

As noted, the statute also requires a showing of drug use on more than one occasion. *Hale*, 785 N.E.2d at 643 (quoting *Bass v. State*, 512 N.E.2d 460, 464 (Ind. Ct. App. 1987)). "[T]he term 'common nuisance' as used within the statute . . . requires proof of a continuous or recurrent violation." *Id.* The court in *Traylor v. State,* 817 N.E.2d 611, 620 (Ind. Ct. App. 2004), held that the residence defendant visited was a "common nuisance" where officers found a briefcase containing baggies of methamphetamine and a glass pipe used for the consumption of methamphetamine, and found glass pipes, some with burnt residue, in other parts of the residence. There was also evidence that the defendant was producing, preparing, and processing methamphetamine within the residence. The court held that "it was reasonable for the jury to infer from the evidence . . . that the . . . . residence was used more than once for the consumption of methamphetamine*." Id.*

The above cases discuss what evidence is needed to support a conviction for visiting a common nuisance. As stated, the government need only show that officers had probable cause to make an arrest, which requires only a probability or a substantial chance that criminal activity exists, not a showing of proof beyond a reasonable doubt.

Based on all the facts known to the officers at the time, we conclude that they had probable cause to arrest

Bullock for visiting a common nuisance. On the day of the search, officers found marijuana in a box in plain view on the dining room table and a lighter next to the marijuana, leading to the inference that it had been smoked inside. Greenlee testified that "you could not have walked through the house without seeing the drugs there in plain view." Bullock had just left the residence and had been inside on multiple occasions.

During the search, officers also found a large ball of plastic baggies that contained a small amount of crack cocaine and a scale in another location. Greenlee opined, based on his experience and training, that the items seized during the search were consistent with both drug distribution and (more importantly, with respect to the common nuisance charge) use. Bullock does not assert that the search was invalid. The discovery of these items corroborated the tipster's information of drug activity within the residence.

As the district court found, a common-sense view of the everyday realities of life would lead officers to reasonably believe that Bullock was aware that drug use had occurred inside the residence, and there was evidence that it occurred on more than one occasion. While the officers could not have been certain that Bullock was aware of the marijuana in the dining room or the other evidence of drug activity found in the residence, they had *probable cause* to believe so based on Bullock's presence in the house that day and his prior association with the residence that led officers to obtain a search warrant for the premises.

Accordingly, for the reasons stated, the judgment of the district court is AFFIRMED.