# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3335

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES CHARLES EDWARD SHOALS, IV,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 05 CR 64—**William C. Lee**, *Judge.*

ARGUED FEBRUARY 22, 2007—DECIDED MARCH 9, 2007

Before BAUER, EVANS, and SYKES, *Circuit Judges.*

PER CURIAM. James Shoals, a felon, was charged with possessing a firearm, 18 U.S.C. § 922(g)(1). Shoals moved to suppress the gun, shotgun shells, and inculpatory statements he made to police, arguing that he was detained without probable cause or reasonable suspicion. The district court found probable cause lacking, but concluded that the police had reasonable suspicion and therefore their encounter with Shoals was a legitimate stop under *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Shoals entered a conditional guilty plea, and now challenges the denial of his motion to suppress. We uphold the denial of Shoals's motion to suppress and affirm his conviction.

## I. Background

At the suppression hearing, five police officers present during the encounter testified. At approximately 1:00 a.m. on April 18, 2005, a caller to 911—whose name, address, and telephone number were known to some but not all of the officers—reported that a gunshot was fired in the 3900 block of Fairfield Avenue in Fort Wayne, Indiana. The caller reported that a black male in a dark jacket and hat had fired a "long gun" before running into either the garage or the house at 3927 Fairfield Avenue.

The first police officer at the scene, Officer Scatena, testified that the caller—who apparently was able to see the officer's car and was still on the line with the dispatcher—directed him to the garage at 3927 Fairfield, near which the caller had seen the shooter park a dark blue or black Chevrolet Lumina. Two more officers arrived at the scene, and—after finding no sign of the shooter in or around the garage—the three officers approached the house; they were joined by a fourth just before they knocked on the front door. All four officers had their guns drawn because the 911 caller had reported gunfire.

The officers testified that initially two people—both black and described in the record only as the "female homeowner" and "male homeowner"—came to the front door. The officers described both as cooperative and said they came out onto the front porch as soon as the officers asked. Officer Scatena testified that the male was wearing a "lighter-colored sweater" and possibly jeans.

Another man—later identified as Shoals—did not come outside in response to the officers' request. One of the officers testified that, through the open front door, he saw Shoals "peering around the corner" from the kitchen; the officer thought Shoals was "trying to hide." The officers then ordered him to come out onto the porch, and he eventually complied. Shoals—who is black and who, according to several officers, was wearing a dark jacket

and hat—matched the description of the shooter given by the 911 caller.

The officers testified that they told Shoals and the male homeowner that they were going to pat the men down for safety reasons. Some of the officers testified that Shoals was handcuffed immediately, but Officer Scatena said he merely was asked to place his hands against a brick wall; the district court did not resolve the question. One officer found six shotgun shells in Shoals's pocket, which prompted Shoals to volunteer that he was not supposed to have ammunition because he was on parole.

At that point, according to the officers, they began asking questions about the Lumina, which was parked behind the garage. At first, Shoals and the male home-owner claimed not to know who owned the car, but when the male homeowner gave the police permission to tow it, Shoals spoke up and admitted that it was his. Officer Scatena said he placed Shoals in handcuffs and read him the *Miranda* warnings after that admission.

The officers obtained Shoals's car keys, although their testimony was inconsistent as to when and how this occurred and the district court did not resolve the question. Officer Brumett testified that he used Shoals's keys to unlock the car, searched it, and found a shotgun in the trunk. He estimated that the shotgun was found five to ten minutes after the shells.

Around this same time, Shoals told Officer Scatena that some people had "shot up" his sister's house several hours earlier, so Shoals had borrowed the shotgun and shells and gone looking for the culprits in order to "take care of that situation." When he did not find them, he fired a round in the alley out of frustration.

Shoals moved to suppress the shells, the shotgun, and his inculpatory statements, arguing (as relevant on appeal) that the police had neither probable cause nor

reasonable suspicion during the stop that led to the discovery of the shells and that the other evidence was fruit of an illegal search. The district court agreed with Shoals that the officers had lacked probable cause. However, the court explained that because the officers were at the address identified by the 911 caller as the locus of the gunshot, had found a car there that matched the 911 caller's description, and had observed Shoals—who matched the caller's description of the shooter—hanging back in the kitchen behaving furtively after the other occupants had exited the house, the officers did have reasonable suspicion to detain and frisk Shoals.

## II. Analysis

On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and questions of law de novo. *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006). The district court held that the police had reasonable suspicion of criminal activity but lacked probable cause when they first encountered Shoals; neither party challenges these conclusions on appeal. Thus the crux of this appeal is whether the officers' conduct during their investigation of Shoals transformed an investigatory stop (permissible given their reasonable suspicion) into a custodial arrest (impermissible absent probable cause). *See Terry*, 392 U.S. at 27; *United States v. Lawshea*, 461 F.3d 857, 860 (7th Cir. 2006). If, as the district court held, the shotgun shells were discovered during a stop-and-frisk authorized by *Terry*, then the officers were free at that point to make a custodial arrest; Shoals's contemporaneous, volunteered admission that he was not supposed to have the shells because he was on parole provided probable cause to arrest him for possessing ammunition. *See Russell v. Douthitt*, 304 N.E.2d 793, 794 (Ind. 1973) (explaining that police had

probable cause to arrest parolee who admitted parole violations).

Shoals argues that the officers—by ordering him to exit the house, drawing their guns, and handcuffing him—effectuated a full custodial arrest rather than a *Terry* stop, but these facts do not individually or collectively establish that Shoals was arrested and not simply detained. It is pointless, of course, for Shoals to focus here on his acquiescence to the officers' command that he exit the house; that just means that he was *seized*—an intrusion that is necessarily present in every *Terry* stop. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Terry*, 392 U.S. at 1; *see also United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005) (holding that seizure occurred when defendant complied with officer's command, made at gunpoint, to stop backing away from front door). What really matters is the manner in which Shoals was seized and what happened afterward. The cases are clear, however, that police officers do not convert a *Terry* stop into a full custodial arrest just by drawing their weapons, *see United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005); *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004), or handcuffing the subject, *see United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004); *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994). The tactics used here were warranted given the inherent danger of the encounter: the officers were responding late at night to a 911 report of gunfire when they encountered Shoals, who matched the description of the suspect, was wearing a coat even though he was indoors, and hung back and hid out in the kitchen until he was ordered outside.

Shoals also argues that even though the police had reasonable suspicion that justified the stop itself, they were not justified in patting him down because there was no evidence when he stepped onto the porch that he was

armed and dangerous. An officer conducting a *Terry* stop may pat down a suspect in order to search for weapons, *Terry*, 392 U.S. at 26, but only if "specific and articulable facts" support a suspicion that the suspect is armed and presents a danger to officers or to others, *see United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). Shoals asserts that the pat-down search was unjustified because the officers could readily see that he was not carrying the "long gun" described by the 911 caller—such a gun couldn't have been concealed on his person. Although the gun ultimately found could not have been concealed on his person, the vague description "long gun" did not rule out the possibility that the gun that was fired was of a concealable size. Moreover, the question is whether the police reasonably believed he was armed with *any* weapon, not only with the weapon described in the 911 call. The officers acted reasonably when they patted Shoals down for their own safety once he finally came outside.

Finally, the only argument Shoals offers for suppressing the shotgun is that it is fruit of the poisonous tree, which fails because the investigatory stop was legal. He makes no argument on appeal concerning suppression of his inculpatory statements.

### III.  Conclusion

We therefore AFFIRM Shoals's conviction.

A true Copy:

       Teste:

                         _____

                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*