**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2007
Decided September 27, 2007

**Before**

Hon. FRANK H. EASTERBROOK, *Chief Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

No. 06-4188

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Indiana, South Bend Division |
| *v.* | No. 06 CR 45 |
| JESSE B. SNOWDEN, JR., *Defendant-Appellant.* | Robert L. Miller, Jr., *Chief Judge.* |

**O R D E R**

Jesse B. Snowden, Jr., entered a conditional guilty plea to one count of possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), and was sentenced to 30 months' imprisonment, followed by three years' supervised release. On appeal he challenges the denial of his motion to suppress the revolver underlying his conviction; he argues that it was seized when the police stopped him without probable cause or reasonable suspicion. We affirm.

This prosecution began as a case of mistaken identity. A DEA task force in South Bend, Indiana, had been hoping to ensnare a drug dealer—who is not identified in this record—for several months prior to Snowden's arrest. With help from an informant, the agents already had made two controlled buys from the

target but had withheld making an arrest. Two other attempts to buy crack from the target had failed. The target had used a different vehicle for each completed transaction: a green minivan that he owned and a blue Oldsmobile. He also told the informant that he would be arriving in a third vehicle—a black truck—during one of the failed transactions. And on two of the four occasions he had changed the meeting location at the last minute, once from the Advance Auto Parts on Lincoln Way West to the McDonald's next door.

In February 2006 the agents arranged another crack delivery, this time intending to make an arrest. The transaction was set to occur at the same Advance Auto Parts used previously. An agent parked a green GMC Colorado pickup, which the target would associate with the informant, in the Advance Auto parking lot. The target was expecting to meet the informant, so the agent exited the pickup and went inside the auto parts store while other agents conducted surveillance. The informant remained with another agent a few blocks away from the scene, but told the target by telephone that he was waiting inside the Advance Auto Parts.

Meanwhile, Snowden and a friend were on their way to pick up Snowden's cousin Brandon Jennings from the McDonald's next door to the Advance Auto Parts. Snowden was driving his green Pontiac Grand Prix with heavily tinted windows. Snowden parked briefly in the McDonald's lot before picking up Jennings and driving off. But Jennings soon discovered that his food order was incomplete, so Snowden reversed course and drove down an access road alongside the Advance Auto Parts lot into the McDonald's parking lot. A wall three feet high separates the two parking lots. Snowden parked in a space close to the restaurant's front door but, coincidentally, directly facing the agents' green pickup in the Advance Auto Parts lot, about 50 to 60 feet away.

Just as Snowden was arriving at the McDonald's for the second time, the target called the informant and told him to come out of the Advance Auto Parts because he was waiting. Agent Radican, who was conducting surveillance, testified that he observed Snowden's Pontiac drive past the undercover pickup. Other agents saw the Pontiac enter the McDonald's lot and park facing the pickup. When Snowden parked, the agents rushed his car. Radican testified that as he approached the car he was looking at the occupants' hands, not their faces, in order to be alert for danger. The agents had their weapons out and told the men to raise their hands and exit the car. The agents ordered the men to lie face down on the ground while they were handcuffed. Snowden was asked if he had a weapon, and he admitted carrying a gun in his pocket. The agents confiscated the weapon, as well as some ammunition. While this was occurring, a local police officer, who only recently had joined the task force, recognized Snowden and knew he was wanted on felony warrants. Snowden was then arrested. Snowden's friend and cousin were released.

Snowden had prior felony convictions and was charged under § 922(g)(1).  He moved to suppress the firearm and ammunition, arguing that he was seized without probable cause or reasonable suspicion.  The district court denied the motion, concluding that the agents conducted a permissible investigatory stop requiring only a reasonable, articulable suspicion.  The district court reasoned that under *Terry v. Ohio*, 392 U.S. 1 (1968), the agents could detain Snowden because (1) the target had arranged to sell crack from the same location in the past; (2) the target had used a variety of vehicles in the past, so the agents could not have known that he wasn't in the Pontiac; (3) Snowden arrived just as the target called the informant to say he was at the scene; and (4) Snowden drove past the Advance Auto Parts lot and parked in the "adjacent McDonald's parking lot" near the government's pickup truck.  After the court's ruling, Snowden pleaded guilty, reserving the right to challenge the suppression ruling on appeal.

On appeal Snowden argues that the district court erred by finding that reasonable suspicion of criminal activity existed under *Terry v. Ohio*.  His premise is that erroneous factual findings undercut the court's legal conclusions.  We review de novo a district court's legal conclusions on a motion to suppress, including the question whether reasonable suspicion existed to justify a stop.  *United States v. Riley*, No. 06-2557, 2007 U.S. App. LEXIS 16250, at *12 (7th Cir. July 10, 2007).

Regardless whether reasonable suspicion existed to detain Snowden, we may uphold the denial of Snowden's motion to suppress on the basis of the outstanding arrest warrants.  We have held that evidence seized as a result of a detention that was unlawful at its inception still may be introduced at trial if the evidence was discovered without exploiting the illegality and through means sufficiently attenuated from the primary taint.  *United States v. Johnson*, 383 F.3d 538, 544 (7th Cir. 2004); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997).  Three factors are relevant to this analysis: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct."  *Green*, 111 F.3d at 521 (*citing Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

The second factor is dispositive here: the agents possessed probable cause to arrest Snowden when they recognized him and realized that he had outstanding arrest warrants.  As we have explained, it "would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant" and search him incident to that arrest.  *Green*, 111 F.3d at 521-23 (holding that lawful arrest based on outstanding warrant constituted intervening circumstance that dissipated any taint caused by stop that lacked reasonable suspicion); *see Johnson*, 383 F.3d at 546 (same).

Snowden's conviction could thus be affirmed on the strength of *Green* and *Johnson*, though the district court's determination of reasonable suspicion is also sustainable. In challenging that determination, Snowden first argues that the district court committed clear error by incorrectly finding facts essential to support its conclusion. Snowden cites two factual findings that he contends are erroneous: (1) that the agents saw Snowden park in the McDonald's lot "adjacent" to the GMC pickup; and (2) that the target told the informant to exit the auto parts store because he was present at the McDonald's.

Findings of fact underlying a suppression ruling are reviewed for clear error. *Riley*, 2007 U.S. App. LEXIS 16250, at *12. A finding of fact is clearly erroneous only if, based upon the entire record, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *United States v. Carani*, No. 06-2007, 2007 U.S. App. LEXIS 16148, at *20 (7th Cir. July 6, 2007).

As to the first finding, Snowden contends that the district court erred in finding that he parked "adjacent" to the pickup because he actually parked 50 to 60 feet away on the other side of a three-foot-high wall. Snowden focuses on the district court's use of the word "adjacent," which the *Oxford English Dictionary* defines as "lying near or close (to); adjoining, contiguous, bordering."

The district court used the word "adjacent" twice. The first time, in the sentence quoted by Snowden, the court said that the "agents saw a green Pontiac park in the McDonald's lot adjacent to the Colorado pickup." Later, though, the court said that the Pontiac "pulled into the adjacent McDonald's parking lot" and "stopped near the Colorado pickup truck." Given this second sentence, which Snowden does not quote, it is not clear from the court's order whether it meant that the McDonald's parking lot is adjacent to the Advance Auto Parts lot—which Snowden does not dispute—or that the Pontiac was actually parked adjacent to the pickup. But even if the court intended the latter meaning, its finding is not clearly erroneous. The record supports a finding that the Pontiac was parked "near or close" to the pickup. Agent Radican testified that the Pontiac "was directly to the west of" the pickup in the McDonald's lot and "was facing" the truck. Radican also testified that an occupant of the Pontiac would be able to look directly through its windshield at the pickup. And while the court did not comment on the 50 or 60 feet separating the two cars, the distance does not make the use of the word "adjacent" to describe their relative positions inaccurate.

Snowden's disagreement with the other disputed finding has more teeth. In its written order the district court states: "The target told the [informant] to come out of the store because he (the target) was present at the McDonald's. The target said, 'Come out, I'm waiting on you.'" The court reiterates this finding later in its order: "The target almost immediately called the [informant] and said he was in the

McDonald's parking lot." The government acknowledges in its brief that there was "no testimony" that the target actually told the informant he specifically was *at McDonald's*.

Still, that does not make the district court's conclusion clearly erroneous. Agent Spangenberg, who was with the informant and listening to their conversation, did testify that the target advised the informant "that he was arriving at the location of the Advance Auto Parts," which is where the meeting was to take place. And, said Spangenberg, it was apparent that the target was actually present at "the location" because he called the informant again when he saw the agents converging on the Pontiac. Spangenberg's testimony does not rule out the possibility that the target was at the McDonald's, which fairly can be characterized as being "at the location" of the Advance Auto Parts. During the suppression hearing, the government played the recording of the target talking to the informant as the investigation unfolded. That recording memorializes the exact words of the target and the informant in context, and would settle the question, yet Snowden has not included the recording or a transcript in the record on appeal. *See* Fed. R. App. P. 10, 11; *Learning Curve Toys, Inc. v. PlayWood Toys*, Inc., 342 F.3d 714, 731 n.10 (7th Cir. 2003); *Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572, 581 (7th Cir. 2001). The district court, however, *did* hear the target's own words, and without having the opportunity to review the entirety of the evidence available to the district court, we conclude that it was not clear error to infer that the target was at the McDonald's.

This conclusion would appear to dispose of Snowden's argument about the reasonableness of his detention. His argument depends on the claim that the target never indicated that he was at the same location as the agents when they saw Snowden's car stop near the GMC pickup. The district court's finding refutes that claim. But to the extent that Snowden still disputes the determination of reasonable suspicion, given all of the underlying factual findings, his argument fails.

*Terry* "authorized the common police practice of stopping a person who is behaving in a suspicious manner to question him briefly and, if the officers are worried that he may be armed, patting him down." *United States v. Goodwin*, 449 F.3d 766, 769 (7th Cir. 2006). Such stops need not be supported by probable cause, but instead only a reasonable suspicion—something more than a hunch—that the suspect has committed a crime or is about to do so. *United States v. LePage*, 477 F.3d 485, 487-488 (7th Cir. 2007). When determining whether an officer had reasonable suspicion, we examine "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006).

The facts support the district court's conclusion that the agents possessed a reasonable suspicion that the target was in the Pontiac and about to commit a crime. Agent Radican testified that he observed the Pontiac "drive through the Advance Auto parking lot" and then pull into the McDonald's parking lot. Other agents saw the Pontiac park directly opposite the undercover vehicle and about 50 to 60 feet away from it. When Radican first noticed the Pontiac, it was traveling slowly "directly past the backside of the undercover vehicle." Radican's testimony is unclear, but a fair inference is that he observed the Pontiac moving down the access road. There was no other activity in the Advance Auto Parts lot at this time. About 30 to 40 seconds after Radican saw the Pontiac, he received word that the target had just told the informant that he was waiting. The agents also knew that the target previously had changed the location of a planned drug transaction from Advance Auto Parts to McDonald's.

Perhaps the government overstates its case when it asserts that the agents *observed* the Pontiac leave the McDonald's and then return shortly thereafter. Snowden did arrive, stop, leave, and then return, and, had the agents actually observed the entire course of events, the case for finding reasonable suspicion would be even stronger. But no agent testified that he observed Snowden arrive at the McDonald's *twice*, and the district court did not rely on Snowden's unusual return visit to the McDonald's as a basis for its determination of reasonable suspicion. Instead, Agent Radican testified that the agents based their decision to approach the Pontiac on "the fact that the vehicle had gone past the undercover car, that the intended target had said he was there waiting for him and wanted him to come out of the store, and at the time that this had all happened that that vehicle had just arrived there." The agents' decision to stop Snowden was therefore largely due to the coincidence of what turned out to be Snowden's exceptionally poor timing. Regardless of how the facts unfolded, they are still sufficient to have given rise to a reasonable suspicion. *See United States v. Askew*, 403 F.3d 496, 499 (7th Cir. 2005) (holding that reasonable suspicion existed where suspect described location of his vehicle over phone to undercover officer); *but see Johnson*, 383 F.3d at 543-44 (holding that arresting officer lacked reasonable suspicion for *Terry* stop given lack of connection between only vehicle on road at 4:30 a.m. in a known drug area and information about illegal activity in same area).

Finally, Snowden contends that the district court erred by finding that the investigatory stop did not exceed the scope of the limited intrusion contemplated under *Terry*. He argues that any reasonable suspicion as to whether the target was in the Pontiac dissipated after the agents seized his vehicle and ordered the occupants out of the car. As a result, Snowden continues, the initial *Terry* stop escalated to an arrest requiring probable cause because the agents questioned him even after discovering that he was not the target.

The district court observed that the record is "incomplete with respect to the precise police conduct when they approached the Pontiac, because Mr. Snowden's motion to suppress didn't raise that issue." Snowden clearly did not raise this issue in his written motion. And at the suppression hearing he elicited only limited testimony about the events after the agents decided to converge on his car. In response to a question by the court during his closing argument, Snowden contended that the use of "excessive force"—by which he meant drawn weapons—turned any legitimate *Terry* stop into a full arrest requiring probable cause.

To the extent that Snowden's argument is preserved for our review, it is unavailing. When police officers reasonably believe they are dealing with a person about to engage in a substantial drug transaction, they may use the degree of restraint necessary for their own control and safety. *See Askew*, 403 F.3d at 506-07 (holding that agents did not escalate *Terry* stop into custodial arrest by blockading suspect's car and approaching with guns drawn); *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) ("When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons."). The record does not support Snowden's contention that the agents immediately realized that neither he nor his companions were the target. For example, Agent Radican testified that it would have been "tough" for him to identify the target even though he had seen his photograph. Rather, the agents maintained that they focused on the men's hands as they were getting them out of the car, asked if they had weapons, and ordered them face-down on the ground. Immediately thereafter Snowden acknowledged he had a gun and he gave it to the officer. Only after that did one of them recognize Snowden. Even then, the agents needed to determine whether either of the other two men was the target. Therefore, the limited use of force was reasonable given the threat they believed the agents were facing.

AFFIRMED.