ROVNER, Circuit Judge,
concurring.
Given this circuit’s seemingly broad tolerance for the use of physical restraints during investigatory detentions, I agree with my colleagues that it would not have been clear to the defendants that handcuffing Rabin and placing him in the back of a squad car constituted an arrest that required probable cause to believe he had committed a crime. Consequently, the defendants are entitled to qualified immunity on the wrongful arrest claim. I write separately to explain why, in my view, the *637 restraints placed on Rabin were not justified by the circumstances of this investigatory detention and transformed the deputies’ encounter with Rabin from a Terry stop into a wrongful arrest. As a result of our decision in Moore v. Madigan, 702 F.3d 933 (7th Cir.2012), reh’g en banc denied, 708 F.3d 901 (7th Cir.2013), the carrying of firearms in public by private citizens may soon become much more common than it heretofore has been in Illinois, and if so there are likely to be many more investigatory stops like this one to ascertain an individual’s authority to carry a firearm. Law enforcement agents must understand and respect the limits on such Terry stops, and we must be clear on what those limits are.
The Supreme Court’s decision in Terry v. Ohio recognized a “narrowly drawn” exception to the traditional rule that seizures of the person must be supported by probable cause to believe the individual has committed a crime. 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). See Florida v. Royer, 460 U.S. 491, 498-99, 103 S.Ct. 1319, 1324-25, 75 L.Ed.2d 229 (1983); Dunaway v. New York, 442 U.S. 200, 208-210, 99 S.Ct. 2248, 2254-55, 60 L.Ed.2d 824 (1979); United States v. Longmire, 761 F.2d 411, 417 (7th Cir.1985). A Terry stop is meant to be a minimal detention, lasting only so long, and intruding on the stopped individual’s liberty only so much, as is necessary for an officer to either confirm or dispel a reasonable suspicion that the stopped individual “has been, is, or is about to be engaged in criminal activity.” United States v. Bullock, 632 F.3d 1004, 1014-15 (7th Cir.2011) (quoting United States v. Vega, 72 F.3d 507, 515 (7th Cir.1995)); see also United States v. Brignoni-Ponce, 422 U.S. 873, 881-82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); Adams v. Williams, 407 U.S. 143, 145-46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). It is because an investigatory stop is meant to be brief and minimally intrusive that the Supreme Court authorized such a detention on a showing of reasonable suspicion rather than probable cause. See United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); Dunaway, 442 U.S. at 210-11, 99 S.Ct. at 2255-56. The reasonableness, and hence the lawfulness, of the stop therefore depend in part on the degree of restraint imposed on the individual. Bullock, 632 F.3d at 1014-15. “Police restraint may become so intrusive that, while not technically an arrest, it becomes tantamount to an arrest requiring probable cause.” Id. at 1016 (citing United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir.1994)) (internal quotation marks omitted).
“Handcuffs are generally recognized as a hallmark of a formal arrest.” United States v. Newton, 369 F.3d 659, 676 (2d Cir.2004) (coll. cases). Certainly this is true as a matter of appearance: because handcuffing is a typical step in effectuating an arrest, people see someone in handcuffs and reflexively think, “That person is going to jail.” And no one in handcuffs thinks, “I am free to leave.” More to the point, he is not free to leave. Short of locking someone behind bars, there is no more concrete and effective way to limit his movement and thereby deprive him of his physical freedom. Once in cuffs, a person’s ability to terminate the encounter and continue on his way depends not only on cooperating with the officer and dispelling his suspicions, but on the officer’s willingness to remove the handcuffs and restore his liberty. All of this is doubly true when the handcuffed individual is placed in the back of a police car.[1] See *638 United States v. Smith, 3 F.3d 1088, 1097 (7th Cir.1993) (Once the defendant was patted down, handcuffed, and told to sit in a specific place by the side of the road, he “was not free to go anywhere. His movement was curtailed as if he were handcuffed to a chair in a detective’s office or placed in a holding pen in a station house or put behind bars.”); United States v. Brown, 233 Fed.Appx. 564, 567 (7th Cir.2007) (nonprecedential decision) (“It is obvious that Brown was seized; his movements were restrained when he sat handcuffed and locked in the squad car and he clearly was not free to leave. Moreover, the officers had initially acquired physical control over him at the time they tackled him, sprayed him with pepper spray, and cuffed him. Obviously, any reasonable person in Brown’s position at that time in the arrest scenario would have considered himself or herself restrained, beyond the limited Terry-like stop, and under ‘arrest.’ ”).
Nonetheless, beginning with our decision in United States v. Glenna, 878 F.2d 967 (7th Cir.1989), we have recognized a very limited set of circumstances in which police may place an individual in handcuffs without thereby converting a Terry stop into a de facto arrest. Our holding in Glenna was founded on evidence that gave police officers reason to be concerned for their safety as they confronted the defendant and attempted to determine whether he was engaged in a crime. The police were observing Glenna based on a Teletype alert indicating that he was involved in a recent drug deal, that he had $100,000 in cash with him, that he was armed, and that he also had some type of explosive device. An officer stopped Glenna when he pulled his van into a gas station, an environment in which firearms and explosives posed even more of a danger than they otherwise would. When, early in the encounter, the officer asked Glenna to produce his identification, Glenna reached into his pocket and the officer observed a bulge in the pocket which he correctly suspected might be an ammunition clip. The officer immediately grabbed Glenna’s hand and removed the loaded clip from the pocket. At that point, the officer placed Glenna in handcuffs before frisking him. The pat-down revealed that Glenna also had a small, explosive “cherry bomb” in a pants pocket. In view of the Teletype indicating that Glenna was potentially armed and dangerous, coupled with the initial discovery of a loaded clip of ammunition on his person, we concluded that it was reasonable to believe that Glenna posed a risk to the safety of the officer who initiated the stop and the others who soon arrived on the scene. That risk entitled officers not only to handcuff Glenna while he was patted down (whereupon the “cherry bomb” was discovered) but to keep him in handcuffs while the officers attempted to confirm or dispel the suspicions of criminal activity raised by the Teletype (which efforts ultimately led to the discovery of a pipe bomb in the van Glenna was driving):
[W]e are unwilling to hold that under Terry, the placing of a suspect in hand *639 cuffs without probable cause to arrest is always unlawful. If, in a rare case, “common sense and ordinary human experience” convince us that an officer believed reasonably that an investigative stop could be effectuated safely only in this manner, see [United States v.] Sharpe, 470 U.S. [675] at 685, 105 S.Ct. [1568] at 1574, 84 L.Ed.2d 605 [ (1985) ], “we will not substitute our judgment for that of the officers as to the best methods to investigate.” See [United States v.] Boden, 854 F.2d [988] at 993[(7th Cir.1988) ].
878 F.2d at 972-73 (emphasis in original).
Subsequent cases have likewise sustained the use of handcuffs during Terry stops when the circumstances suggested either that an individual stopped for questioning might have a weapon or that he might be involved in criminal activity often associated with violence. See, e.g., United States v. Smith, 697 F.3d 625, 632 (7th Cir.2012) (suspected bank robber left alone with single agent while other agents chased his fleeing accomplices); United States v. Hopewell, 498 Fed.Appx. 609, 611 (7th Cir.2012) (non-precedential decision) (officers had tip defendant might be concealing gun); Bullock, 632 F.3d at 1016 (officers were searching for drugs, and drugs are associated with dangerous and violent behavior and thus warrant extra caution); United States v. Snowden, 250 Fed.Appx. 175, 181 (7th Cir.2007) (nonprecedential decision) (agents had reason to believe defendant was about to engage in substantial drug transaction); United States v. Shoals, 478 F.3d 850, 853 (7th Cir.2007) (per curiam) (“inherent danger” posed by defendant, who matched late-hour 911 report of individual engaging in gunfire, was wearing coat indoors, and had attempted to hide from police); United States v. Stewart, 388 F.3d 1079, 1085 (7th Cir.2004) (defendant matched description of aimed perpetrator of recent bank robbery and behaved suspiciously); United States v. Hendricks, 319 F.3d 993, 1004 (7th Cir.2003) (defendant took abnormally long time to respond to request for identification and vehicle registration, he fumbled with something officer could not see, and ammunition magazine was found on his person during patdown); United States v. James, 40 F.3d 850, 875 (7th Cir.1994) (police had received tip of suspicious activity in hotel room, a loud argument had been heard there, and gun and cash were discovered in room), cert, granted & judgment vacated on other grounds, 516 U.S. 1022, 116 S.Ct. 664, 133 L.Ed.2d 515 (1995).
A second line of cases has relied on the risk of flight to justify the use of handcuffs while the detained individual is being questioned. See, e.g., Bullock, 632 F.3d at 1016 (officers had reason to believe suspected cocaine dealer presented flight risk in addition to safety risk, given his knowledge that police had warrant to search residence where he made his cocaine sales); United States v. Carlisle, 614 F.3d 750, 756 (7th Cir.2010) (defendant attempted to escape house with backpack during drug sweep); United States v. Wilson, 2 F.3d 226, 231-32 (7th Cir.1993) (defendant had attempted to flee); Tom v. Voida, 963 F.2d 952, 958-59 (7th Cir.1992) (defendant had disobeyed multiple orders to stop).
These decisions are consistent with our observation in Glenna that it will be the rare case in which it will be necessary, and thus consistent with the purpose and scope of a Terry stop, to temporarily immobilize a person with handcuffs while a police officer attempts to confirm or dispel a reasonable suspicion of criminal activity. There is an obvious dissonance between the use of handcuffs, which signals an arrest, and a Terry stop, which is meant to be a modest seizure short of and distinct *640 from an arrest. Authorizing the use of handcuff's when the purpose of the Terry stop cannot be accomplished without them—when the person being questioned would otherwise flee, or when he would otherwise pose a danger to the officers doing the questioning—reconciles the conflict in a logical way. See Glenna, 878 F.2d at 974-75 (Flaum, J., dissenting). Those cases should be few and far between, and the facts justifying the application of an arrest-like restraint should be concrete and compelling. See United States v. Chaidez, 919 F.2d 1193, 1197-98 (7th Cir.1990) (the more intrusive the seizure, the more justification for the seizure there must be).
Yet, despite the limits evident in the foregoing decisions, we occasionally make statements suggesting that the use of handcuffs during Terry stops is something less than a rare occurrence requiring particularized factual justification. We sometimes remark, for example, that the use of handcuffs by itself does not necessarily transform an investigatory stop into a de facto arrest, without adding that handcuffs will be justified only in the un usual case— almost as if we are indulging a rebuttable presumption that handcuffs are consistent with a standard Terry stop. See, e.g., Carlisle, 614 F.3d at 756; Shoals, 478 F.3d at 853; United States v. Robinson, 30 F.3d 774, 782 n. 3 (7th Cir.1994); Smith, 3 F.3d at 1094-95. On other occasions we have observed that “[f]or better or for worse, the trend [of cases granting greater latitude to employ force during a Terry stop] has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention,” as if to suggest that we will, inevitably, continue to broaden the range of circumstances in which forcible restraint may be used during Terry stops. Tilmon, 19 F.3d at 1224-25; Vega, 72 F.3d at 515; United States v. Askew, 403 F.3d 496, 507 (7th Cir.2005); see also Stewart, 388 F.3d at 1084 (“The permissible scope of a Terry stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars.”). When divorced from their context, statements along these lines could be read to imply that we no longer regard the use of handcuffs during Terry stops as the exception but rather the rule.
It would be unfortunate (and mistaken) for police departments and their attorneys to take that message from our case law. In fact, we have always demanded that there be some reason for police officers to believe that handcuffing a stopped individual is necessary to effectuate the legitimate purpose of an investigatory detention, be it to prevent an uncooperative person from fleeing or to preserve officer safety. Even the one case in this line that represents a departure from its predecessors ultimately makes this same point. In United States v. Yang, 286 F.3d 940, 950 (7th Cir.2002), we sustained the use of handcuffs while a defendant suspected of attempting to smuggle opium into the country was transported from a domestic airport terminal to the international terminal for questioning. We candidly acknowledged that the circumstances were different from those in prior cases, in that the defendant did not pose a threat to the officers questioning him nor did he pose a flight risk. Id. at 950. Yet, logistically it was necessary for investigative purposes to transport the defendant by van to the international terminal, where drug testing equipment was available. And the ride from terminal to terminal took the defendant across the airport tarmac, a highly-restricted area in which the presence of any unauthorized, unrestrained individual posed a safety risk. Id. The generalized *641 but heightened need for safety in an especially sensitive environment thus supported the use of handcuffs notwithstanding the absence of any indication that this defendant in particular posed a threat. In that regard, circumstances warranting the temporary use of handcuffs in Yang were “quite unique.” Id. Thus Yang, in distinguishing our other cases, ultimately confirms that the range of circumstances in which handcuffs may be used is narrow. Even if those circumstances have turned out to be not quite as rare as we envisioned in Glenna, they are nonetheless limited and definite.
However, given our failure as a court to make explicit the limits which I believe are implicit in the facts and rationale of our decisions, along with our occasionally uncabined language regarding the use of handcuffs during Terry stops, I must join my colleagues in holding that the defendants here are entitled to qualified immunity. The defendants are entitled to such immunity unless the right they are accused of violating was clearly established at the time of their actions, e.g., Hernandez v. Sheahan, 711 F.3d 816, 817 (7th Cir.2013); and whether that right was clearly established must be answered with reference to the specific facts of the case rather than at a high level of generality, e.g., Surita v. Hyde, 665 F.3d 860, 868 (7th Cir.2011); Borello v. Allison, 446 F.3d 742, 750 (7th Cir.2006); Carlson v. Gorecki, 374 F.3d 461, 466 (7th Cir.2004). Thus, the question is not whether it was clear, in December 2009, that Rabin had a Fourth Amendment right not to be arrested absent probable cause to believe he had committed a crime; that much is beyond dispute. The question, rather, is whether it would have been clear to a reasonable police officer that handcuffing someone in the course of a Terry stop initiated to determine that person’s authority to carry a firearm in public—when the firearm has already been taken from him—-transformed the stop into a de facto arrest requiring probable cause. I agree that the answer to that question is “no.” Determining whether and when an investigatory detention becomes an arrest is a highly fact-dependent inquiry. E.g., Stewart, 388 F.3d at 1085. We have described the line between the two as “dim and wavering.” United States v. Lechuga, 925 F.2d 1035, 1039-40 (7th Cir.1991). And I can identify no prior case making clear that the use of handcuffs in the scenario presented here would take an investigatory detention across that difficult-to-diseern boundary. In view of our statements about the “trend” toward allowing the use of handcuffs and other forcible restraints during Terry stops, and our continuing reaffirmation that the use of handcuffs will not necessarily transform such a stop into an arrest, I believe that a reasonable officer could have thought the use of handcuffs was consistent with the permissible purpose and scope of the stop, particularly one involving a firearm. Officer safety has been a recurring theme in our cases sustaining the use of handcuffs during investigatory detentions. And although Rabin claimed a legal right to carry his firearm—which he had readily surrendered to Flynn at the beginning of the encounter— an officer might have reasonably thought that he was free to handcuff any individual being investigated for the possible illegal possession of a weapon in the name of safety, without transforming the investigatory stop into an arrest.
That said, I am compelled to point out that none of the concerns we have previously cited to authorize the use of handcuffs during a Terry stop was present here. The sole basis for the detention of Rabin was his carrying of a firearm. There was no report or ground on which to suspect that he had misused the weapon or committed any crime apart from the (potentially) illegal possession of a firearm in *642 public; the police stopped Rabin on no basis other than the fact that he had a gun. He exhibited no suspicious, evasive, or aggressive behavior. He was calm and cooperative, responded appropriately to Flynn’s inquiries, and presented to Flynn evidence of his identity, his status as a licensed private investigator, and his authority to carry a firearm. Knepper would later confirm that Rabin had served a court order on a tenant of the building, just as he had represented to Flynn. Whatever risk to officer safety Rabin’s possession of the weapon might have posed at the outset of the encounter was eliminated when Flynn took possession of the weapon. Nothing suspicious was discovered during the subsequent frisk of Rabin’s person. Apart from the possibility that Rabin’s possession of the weapon in public might have been illegal (notwithstanding his Firearm Control Card or “Tan card”), there was no basis to believe that he posed an independent threat to the officers. Rabin never made any attempt to flee. In short, there was no need to handcuff Rabin and then secure him in a police car in order to effectuate the purpose of the Terry stop; the notion that physical restraint was justified became altogether spurious once other deputies had joined Flynn at the scene. Rabin’s authority to carry the firearm could have been ascertained without handcuffing him and locking him away in a caged squad car.
To conclude otherwise would be to suggest that carrying a firearm in public will routinely justify not only a Terry stop but the highly intrusive, physical restraint on liberty that handcuffing represents. I can, of course, appreciate the need for police caution in approaching someone they know or suspect is armed. But if the carrying of concealed firearms in Illinois is on the verge of being legalized broadly, as our decision in Moore may portend, then the possession of a gun in public cannot by itself be reason to suspect that a stopped person poses a danger that justifies an arrest like restraint. Once such an individual claims the right to lawfully carry the firearm, presents documentation to that effect, and has surrendered the firearm to the officer without incident while his authority is being checked, I can see no need for physical restraint absent some additional information suggesting he or she poses a potential danger to the officer or is about to flee. Short of jailing a person, I can imagine no greater intrusion on his freedom than placing him in manacles and installing him in the back of a caged police car. See Terry, 392 U.S. at 8-9, 88 S.Ct. at 1873 (“ ‘No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or the interference of others, unless by clear and unquestionable authority of law.’ ”) (quoting Union Pac. R.R. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)); Arizona v. Evans, 514 U.S. 1, 23, 115 S.Ct. 1185, 1197, 131 L.Ed.2d 34 (1995) (Stevens, J., dissenting) (citing the mistaken arrest, handcuffing, and search of an individual in a public street as an “offense to the dignity of the citizen”); Love v. City of Port Clinton, 37 Ohio St.3d 98, 524 N.E.2d 166, 167 (1988) (“The acts of subduing and handcuffing are undoubtedly offensive to a reasonable sense of personal dignity.”) (internal quotation marks omitted). Allowing such restraints to be imposed absent some indicia of danger would be a heavy tax on the right to carry a firearm; a right that comes at such an expense arguably is no right at all.
A final word about the length of the stop in this case. Rabin was detained for 90 minutes, which was far too long given the purpose of the stop. Cf. Place, 462 U.S. at 709-10, 103 S.Ct. at 2645-46 (90-minute detention of defendant’s luggage was ex *643 cessive under Terry: “we have never approved a seizure of the person for the prolonged 90-minute period involved here and do not do so on the facts presented by this case”). The delay in releasing Rabin was due to the fact none of the three deputies knew what a Tan card was and no one (including the dispatcher) knew how to verify Rabin’s authorization to carry a firearm. This pervasive ignorance suggests a failure on the part of their employer to train them adequately. I presume that this case represents an aberration, and that if and when the carrying of firearms by private citizens becomes more common in Illinois, confirming an individual’s authority to carry a firearm in public will become a routine and quick task. (I also presume that Illinois will issue a more reliable means of identifying those authorized to carry weapons; the Tan card, which does not bear a photograph of the bearer, is little more reliable and secure from forgery than a library card.) Still, there will no doubt be future instances in which there is some discrepancy in the gun holder’s identification or there is some system failure that makes it impossible for an officer to promptly confirm an individual’s authorization to carry a firearm. As my colleagues point out, Rabin’s counsel conceded at oral argument that the defendants could properly detain Rabin until such time as they confirmed the legitimacy of his Tan card. That concession makes it unnecessary for us to decide in this case whether the deputies were obligated to release Rabin once it became clear that they could not quickly ascertain whether he was legally authorized to carry a gun. I would just note, as my colleagues do, that authorities in this situation always have the option of releasing the individual and retaining his firearm while they investigate his authority to carry the gun. See, e.g., Schubert v. City of Springfield, 589 F.3d 496, 503 (1st Cir.2009) (when, after five minutes of checking, officer was unable to confirm validity of detainee’s gun license due to lack of centralized database, officer told detainee he was free to go and could retrieve his gun and gun license from the police department at a later time). Detaining an individual’s firearm typically will not interfere with his freedom to the extent that detaining a traveler’s luggage might, cf. Place, 462 U.S. at 708-09, 103 S.Ct. at 2645, and would be consistent with the Supreme Court’s admonition that “the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.” Royer, 460 U.S. at 500, 103 S.Ct. at 1325-26.
It is for these reasons that I concur in the court’s decision.

. My focus in this concurrence will be on the use of handcuffs. Rabin, of course, was not only handcuffed but placed in the back of a caged squad car. Needless to say, placing *638 someone in the back of a police car against his will is itself a restraint on his freedom. Much of what I have to say about the decision to place Rabin in handcuffs will therefore apply to the additional decision to secure him in the squad car. There may well be situations in which having someone sit in a police car will be justified by something other than a need to restrain him: to protect him from others, to shelter him from the weather, or to proceed with the Terry stop in a more convenient setting, where the officer questioning the person has access to a computer terminal, for example. No such justification is evident from the facts in this case; it appears that Rabin was placed in the car solely as a means of restraining him. That additional restraint only compounded the intrusiveness of the encounter.