# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00582-COA

JOHN E. WRENN A/K/A JOHN E. WRENN JR. A/K/A JOHN EDWARD WRENN A/K/A JOHN WRENN

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

DATE OF JUDGMENT: 04/24/2017
TRIAL JUDGE: HON. GERALD W. CHATHAM SR.
COURT FROM WHICH APPEALED: DESOTO COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: ANNA K. ROBBINS
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA MCCLINTON
DISTRICT ATTORNEY: JOHN W. CHAMPION
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 11/20/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., WILSON AND TINDELL, JJ.

### WILSON, J., FOR THE COURT:

¶1. A police officer stopped John Wrenn's truck because he believed that it fit the description of the truck driven by a fleeing suspect who had fired his shotgun minutes earlier during a disturbance at a nearby home. The officer suspected that Wrenn was armed, so he waited for backup to arrive before approaching the truck. With guns drawn and trained on the truck, officers ordered Wrenn to exit the truck and then handcuffed him while they briefly searched the truck to make sure that no one else was inside. The officers immediately found a sawed-off shotgun and shells in the cab of the truck. Wrenn subsequently was indicted for

possession of a firearm by a convicted felon. Prior to trial, he filed a motion to suppress all evidence that was seized during the search of his truck or collected thereafter, arguing that there was no probable cause for the stop. The trial judge denied Wrenn's motion. Following a jury trial, Wrenn was convicted and sentenced to serve ten years in the custody of the Department of Corrections as a habitual offender. On appeal, Wrenn challenges the denial of his motion to suppress. However, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On April 4, 2011, around 11:30 p.m., Horn Lake emergency dispatch received a call from a woman who lived on Heather Cove. She reported that a man two houses down was causing a disturbance loud enough to wake her up. Following an audible bang, the woman told the dispatcher that the man had just fired a gun. She then told the dispatcher that the man was driving away from Heather Cove in a large, loud, white truck, possibly a Ford F150 or a Chevy. The dispatcher sent the information out over the radio and told the caller that officers were on the way.

¶3. Dorothy Frazier lived at the house where the disturbance and shooting occurred. Between 11:15 and 11:30 p.m., she woke up to the sound of her husband and Wrenn arguing on the front porch. Her husband told Wrenn to leave several times, but Wrenn refused. Frazier also called 911. While she was on the phone, Wrenn went to his truck, opened the door, and took out a shotgun. He pointed the gun at the Fraziers and then fired into the air. Wrenn and the Fraziers then heard sirens, and Wrenn jumped into his truck and fled.

¶4. Officer Martin Gipson was on patrol that night nearby. He heard a gunshot and a

2

radio dispatch about a disturbance on Heather Cove, which was in the general direction of the gunshot. Gipson responded to Heather Cove within five minutes of the gunshot. Frazier told Gipson that her husband had been in an argument with a man and that the man had been drinking, and Gipson relayed that information over the radio.

¶5.     Officer Ken Magill was sent to Heather Cove in response to the disturbance call. While he was en route to Heather Cove, the dispatcher informed him that shots had been fired. As Magill neared Heather Cove, the dispatcher advised him that the suspect was driving a white truck and traveling north away from Heather Cove. When Magill approached the corner of Heather Cove, there were two people standing outside pointing north. Magill drove north and spotted a truck that he believed fit the description of the suspect's truck. He followed the truck and initiated a stop about half a mile from Heather Cove. Based on dispatch reports, Magill believed that the driver might be armed, so he waited for additional officers to arrive.

¶6.     Once backup arrived, Magill ordered the driver to get out of the truck and approach him slowly. The officers had their guns drawn on the driver, later identified as Wrenn, as he exited and approached them. The officers "conducted a quick *Terry* pat of [Wrenn] for weapons, handcuffed him, [and] put him in the back of [Magill's patrol] car for security purposes."[1] The officers immediately noticed that Wrenn smelled of alcohol and that his speech was slurred, and Wrenn admitted that he had been drinking. Accordingly, the officers placed Wrenn under arrest for suspicion of driving under the influence. Officers then "did

_____

[1] *See Terry v. Ohio*, 392 U.S. 1 (1968).

3

a quick search of [Wrenn's truck] to make sure there was nobody else in the vehicle," at which point they saw a sawed-off shotgun and shotgun shells in the cab of the truck.

¶7.     Detective Tim Stark interviewed Wrenn around 2 a.m., after enough time had passed for Wrenn to "sober up." Stark advised of Wrenn of his *Miranda* rights, and Wrenn signed a *Miranda* waiver and gave a recorded statement. Wrenn admitted that the shotgun was his and that he had been drinking heavily prior to his arrest. He also admitted that he knew that it was illegal for him to have the gun because he was a convicted felon.

¶8.     Wrenn was indicted as a habitual offender for possession of a firearm by a convicted felon. He pled guilty as a habitual offender, and the court sentenced him to serve ten years in the custody of the Mississippi Department of Corrections (MDOC). Wrenn attempted to appeal, but his appeal was dismissed because there is no right of appeal from a conviction or sentence entered on a guilty plea. *Wrenn v. State*, 121 So. 3d 913 (Miss. 2013). However, this Court later set aside Wrenn's plea and conviction because he was misinformed regarding the mandatory sentence under the habitual offender statute. *Wrenn v. State*, 207 So. 3d 1252 (Miss. Ct. App. 2017). After his conviction was set aside, Wrenn's case was returned to the circuit court's active docket.

¶9.     Prior to trial, Wrenn moved to suppress all evidence obtained after the police stopped his truck. Wrenn argued that the police lacked probable cause to stop or search his truck. At the suppression hearing, Gipson, Magill, and Stark gave testimony consistent with the facts discussed above. Magill testified that he stopped the truck a half mile from the house where shots had just been fired. The truck matched a witness's description of the suspect's

4

truck, except that it was "very light blue" or "powder blue" rather than white.  Magill

believed that, at 11:30 p.m., the caller could have been mistaken about the truck's color.  He

testified that there were "not many vehicles on the road" in the residential area at that time

of night, and he did not see and was not aware of any other truck in the area that matched the

description of the suspect's truck.  Magill testified that they ordered the suspect out of the

car at gunpoint for the officers' "security and the security . . . of . . . the suspect," as they

believed the suspect could be armed.  At the conclusion of the hearing, the judge found that,

based on the totality of the circumstances, there was probable cause for the stop.

¶10.    Wrenn's case then proceeded to trial.  Frazier, Gipson, Magill, and Stark testified in

the State's case-in-chief, and Wrenn rested without testifying or calling any witnesses.  The

jury returned a guilty verdict, and the court sentenced Wrenn to serve ten years in MDOC

custody as a habitual offender.  Wrenn filed a post-trial motion for judgment notwithstanding

the verdict (JNOV) or a new trial, which was denied, and a timely notice of appeal.

## ANALYSIS

¶11.    Wrenn raises only one issue on appeal: whether the trial judge erred by denying his

motion to suppress.[2]  Wrenn argues that there was no probable cause for the traffic stop and

that all evidence obtained as a result of that stop should have been suppressed.  However, we

hold that, at the very least, Magill had reasonable suspicion for an investigatory stop of

Wrenn's truck.  In addition, Magill and other officers did not exceed the boundaries of a

_____

[2] Wrenn also argues that the trial judge erred by denying his post-trial motion for JNOV or a new trial.  However, that argument is based entirely on Wrenn's claim that the judge should have granted his motion to suppress and excluded the evidence against him. Therefore, it is unnecessary to address Wrenn's JNOV/new trial argument separately.

5

valid investigatory stop. Therefore, the trial court did not err by denying Wrenn's motion to suppress.

¶12. A "mixed standard of review" applies to Fourth Amendment claims. *Eaddy v. State*, 63 So. 3d 1209, 1212 (¶11) (Miss. 2011). "[D]eterminations of reasonable suspicion and probable cause should be reviewed de novo on appeal." *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (¶11) (Miss. 1999). However, we review the trial judge's "findings of historical fact only for clear error." *Id.*

¶13. "[A]n officer may make a brief, investigatory stop of a vehicle if the officer has reasonable suspicion to believe that the occupants of the vehicle have been, are currently, or are about to be involved in criminal activity." *Martin v. State*, 240 So. 3d 1047, 1050 (¶9) (Miss. 2017); *see also United States v. Hensley*, 469 U.S. 221, 226-29 (1985) (recognizing that an investigatory *Terry* stop of an automobile is constitutionally permissible based on reasonable suspicion that the occupants were involved in a completed crime). Reasonable suspicion must be "grounded in specific and articulable facts" and "can arise from an officer's personal observations, a tip by a trusted informant, or even an anonymous tip." *Cooper v. State*, 145 So. 3d 1164, 1168 (¶11) (Miss. 2014). "Thus, reasonable suspicion is based on something less than the personal observation of a violation of law. Reasonable suspicion is the standard for a stop or search based on suspicious activity that does not yet amount to criminal activity, but which compels an officer to believe that criminal activity has happened, is happening, or is about to happen." *Martin*, 240 So. 3d at 1051 (¶11).

¶14. "Probable cause, on the other hand, is a higher standard and requires a higher level

6

of suspicion than reasonable suspicion." *Id.* at (¶12). Most traffic stops are based on probable cause because they are based on a law enforcement officer's direct observation of a traffic violation. *See id.* An officer who witnesses an actual violation necessarily has probable cause to stop the vehicle.

¶15. In this case, however, Magill did not witness Wrenn commit a traffic violation. Officers subsequently determined that Wrenn had been drinking, and he was arrested on suspicion of driving under the influence. But Magill did not know or have reason to believe that Wrenn was under the influence when he initiated the stop. Rather, Magill stopped Wrenn because he suspected that Wrenn was the same man who had fired a gun during a disturbance on Heather Cove only minutes earlier.

¶16. We hold that, at minimum, Magill had reasonable suspicion to initiate an investigatory stop of Wrenn's truck.[3] When Magill came upon Wrenn's Ford F-150, he knew that a shooting had occurred about three minutes earlier at a house about half a mile away. He knew that a witness had reported that the suspect fled in a large white truck, possibly a Ford F-150 or a Chevy. He also had information that the suspect's truck was headed north in the same direction that Wrenn's truck was traveling. Wrenn's truck was "very light blue" or

---

[3] Wrenn argues that because the trial judge found that probable cause existed, we should not consider the State's alternative argument that there was reasonable suspicion for an investigatory stop. However, as stated above, whether the issue is probable cause or reasonable suspicion, we review the trial judge's legal determination de novo. *Floyd*, 749 at 113 (¶11). Moreover, the trial judge's finding that the higher standard of probable cause was satisfied necessarily implies a finding that the lower standard of reasonable suspicion was also met. *See Jones by Jones v. Webb*, 45 F.3d 178, 183 n.3 (7th Cir. 1995); *see also California v. Hodari*, 499 U.S. 621, 635 (1991) (explaining that "reasonable suspicion" requires "a quantum of proof less demanding than probable cause" (quotation marks omitted)). Accordingly, we may consider the State's alternative argument.

"powder blue," not white, as reported by the witness. However, Magill did not observe any other truck that fit the witness's description, and there were few cars on the road late at night (approximately 11:30 p.m.) in this residential area. Under the circumstances, it was reasonable for Magill to conclude that the witness was simply mistaken about the color of the truck. Based on the totality of the circumstances known to Magill, we hold that he had reasonable suspicion, grounded in specific and articulable facts, to believe that Wrenn was the suspect fleeing the recent shooting a short distance away on Heather Cove.

¶17. In addition, we reject Wrenn's contention that the officers exceeded the scope of a valid *Terry* stop when they ordered him from his truck at gunpoint and then handcuffed him. During a *Terry* stop, officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235 (holding that an officer's effectuation of a *Terry* stop with his gun drawn "was well within the permissible range in the context of suspects who are reported to be armed and dangerous"). Therefore, "it cannot be said that whenever police draw weapons the resulting seizure must be deemed an arrest rather than a stop . . . . The courts have rather consistently upheld such police conduct when the circumstances . . . indicated that it was a reasonable precaution for the protection and safety of the investigating officers." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.2(d) (5th ed. 2012) (collecting cases).

¶18. For example, in *United States v. Shoals*, 478 F.3d 850 (7th Cir. 2007), the Seventh Circuit rejected an argument similar to the one that Wrenn makes in this case. In *Shoals*, a

911 caller reported that a gunshot had been fired and that the shooter had fled into a house. *Id.* at 851. The defendant argued that responding officers "effectuated a full custodial arrest rather than a *Terry* stop" "by ordering him to exit the house, drawing their guns, and handcuffing him." *Id.* at 853. However, the court held that the officers' actions did "not individually or collectively establish that [the defendant] was arrested and not simply detained." *Id.* The court stated that "[t]he cases are clear . . . that police officers do not convert a *Terry* stop into a full custodial arrest just by drawing their weapons." *Id.* Finally, the court held that the officers' "tactics . . . were warranted given the inherent danger of [their] encounter: the officers were responding late at night to a 911 report of gunfire when they encountered [the defendant], who matched the description of the suspect" and then behaved suspiciously after the officers arrived. *Id.*; *see also, e.g.*, *United States v. Sanders*, 994 F.2d 200, 203-11 (5th Cir. 1993) (holding that an officer was justified in drawing his weapon and handcuffing suspect as part of a *Terry* stop when responding to a call about a suspicious person carrying a gun); *United States v. Serna-Barreto*, 842 F.2d 965, 967-68 (7th Cir. 1988) (holding that an officer was justified in drawing his weapon as part of a nighttime *Terry* stop of possibly armed suspects who "were seated in a car" and thus not in "full view" of the officer).

¶19. Clearly, "[i]t is not nice to have a gun pointed at you by a policeman[.]" *Serna-Barreto*, 842 F.2d at 968. However, "it is worse to have a gun pointed at you by a criminal." *Id.* That is the "tradeoff" that officers must make when determining whether it is necessary to draw their weapons or handcuff a suspect during a *Terry* stop. *Id.* Here, Magill and his

9

fellow officers took reasonable precautions to avoid having a gun pointed at them during a valid *Terry* stop. They encountered Wrenn late at night and reasonably suspected that he was armed and had fired his weapon during a disturbance at a nearby home only a few minutes earlier. Magill was sufficiently concerned about his safety to wait for backup to arrive before he directed Wrenn to get out of the truck. Magill testified that Wrenn was handcuffed for the officers' safety so that they could confirm that there was no one else in the truck. Officers then "did a quick search of [Wrenn's truck] to make sure there was nobody else in the vehicle," at which point they found the sawed-off shotgun and shells. We hold that the officers' actions were fully consistent with their authority "to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235.

¶20. In summary, Magill initiated a valid *Terry* stop because he had at least reasonable suspicion, grounded in specific and articulable facts, that Wrenn was involved in the recent shooting nearby. In addition, the officers did not exceed the boundaries of a valid *Terry* stop by taking reasonable precautions to protect their own safety and to carry out the limited investigation permitted under *Terry*. Therefore, Wrenn's conviction and sentence are **AFFIRMED**.

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**